IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| D. ANGUS LEE, Grant County Prosecuting Attorney, by and through the Office of the Grant County Prosecuting Attorney, | ) ) ) ) | No. 31519-3-III |
| Respondent, | ) ) | |
| | ) | PUBLISHED OPINION |
| v. | ) ) | |
| JERRY JASMAN, a single person, | ) ) | |
| Appellant. | ) | |

FEARING, J. — We address today an action in quo warranto, Latin for "by what

warrant?" Jerry Jasman and Grant County Coroner Craig Morrison appeal from a trial

court order removing Jasman from the position of Grant County deputy coroner and

enjoining him from signing death certificates. The specific question we address is

whether one who holds the position of deputy county coroner and performs the task of

signing death certificates is a "public officer" subject to disqualification under RCW

9.92.120 because of a conviction of a crime? We answer in the affirmative and sustain

the trial court's orders. We also affirm the trial court's denial of Jerry Jasman's and

Grant County Coroner Craig Morrison's demand that Grant County reimburse them attorney fees incurred in the defense of this action.

After oral argument, Jerry Jasman and Craig Morrison filed, with this reviewing court, a motion to vacate the decision below and dismiss the appeal on the ground of judicial estoppel. Before the trial court ruled on this first action, Jasman and Morrison filed a second action in Grant County Superior Court seeking recovery of attorney fees. During the course of that lawsuit, Grant County argued that this first action was not a quo warranto action. According to Jasman and Morrison, Grant County Prosecutor Angus Lee, who initiated this quo warranto action, should be precluded from any relief because of an inconsistent statement in the second suit. Jasman and Morrison ask this court to vacate the trial court's injunction and dismiss this appeal. Jasman and Morrison seek recovery of reasonable attorney fees and costs. In turn, Angus Lee characterizes the motion to vacate as frivolous and asks this court to grant him reasonable attorney fees and costs incurred in responding to the motion to vacate. We deny the motion, because judicial estoppel could apply only in the second lawsuit, and this suit constitutes the first suit. We deny Angus Lee recovery of reasonable attorney fees.

## FACTS

The factual background begins with criminal conduct of Jerry Jasman during his short term as Grant County Coroner, which conduct the Grant County Prosecuting Attorney Angus Lee claims disqualifies Jasman from public office.

2

In 2009, Jerry Jasman served as the elected Grant County Coroner. On June 26, 2009, Jasman drove the Grant County Coroner's truck towards his home, with Deputy Coroner Lynnette Henson as a passenger. Jasman intended to return home from work and allow Henson use of the truck since she remained on call. The two argued, after which Henson asked Jasman to stop the truck and allow her to exit. Jasman refused. Henson pled again for Jasman to allow her to leave the truck, but Jasman yelled profanity. He slammed the truck brakes. With the truck nearly stopped, Henson opened her truck door to exit, but Jasman abruptly accelerated and turned the truck. Henson was unable to escape the hegemony of her boss.

Lynette Henson continued to beg for egress from the county truck as Jerry Jasman drove in the direction of Henson's home. Henson employed the truck's two-way radio to solicit help. Jasman summarily disabled the radio. Eventually, Jasman reached Henson's home, where she safely exited the truck. Before her exodus, Henson asked Jasman to let her person go at least thirty times.

As a result of his conduct on June 26, 2009, the State of Washington charged Jerry Jasman with unlawful imprisonment in violation of RCW 9A.40.040, a class C felony. Because of a possible conflict of interest, based on Jasman being an elected Grant County official, Grant County Prosecuting Attorney D. Angus Lee garnered assistance from the State of Washington Attorney General's Office to prosecute the charge. On September 30, 2009, Jasman pled guilty to the amended charge of disorderly conduct in violation of

3

RCW 9A.84.030(1)(a), a misdemeanor. The court sentenced Jasman to one day in jail and imposed a fine of $500 and costs of $510. The court also continued a restraining order in favor of Lynette Henson and ordered Jasman to attend counseling. In the judgment and sentence, Jerry Jasman acknowledged "the forfeiture of his right to hold public office, as provided in RCW 9.92.120." Clerk's Papers (CP) at 74. Jasman then resigned from the office of Grant County Coroner.

On November 2, 2010, Grant County voters elected Craig Morrison as County Coroner. Morrison assumed the office on November 22, 2010. On the same day, Coroner Morrison hired Jerry Jasman as his deputy and chief investigator, and Jasman executed an "Oath of Office" as Grant County Chief Deputy Coroner. CP at 161. According to Morrison, Jasman's experience and training rendered Jasman the most qualified person to work in the Grant County Coroner's Office. While using the title of chief investigator, Jasman completed and signed multiple death certificates on behalf of the Grant County Coroner. Jasman remains today the only employee of the Grant County Coroner other than the coroner himself.

Jerry Jasman did not file his oath of office as Grant County Chief Deputy Coroner with the Grant County Auditor. Nor did Jasman post an official bond. The Grant County Coroner's Office letterhead listed Jasman as "Chief Investigator." CP at 92.

In February 2004, Grant County published a job description for chief deputy coroner, which still applied when Jerry Jasman accepted that position in December 2010.

4

The job description reads, in relevant part:

> Position Purpose
> Investigate and document deaths within the County to determine causes of death and to preserve accurate records of such deaths.
> Distinguishing Characteristics
> The position is one of only two in the Coroner's office, serving on a rotating 24-hour on call basis with the County Coroner, in addition to regular office hours. While the focus of the job is on investigating causes of deaths and preserving evidence, the job also requires its incumbent to respond with consideration when confronted with the emotional circumstances of survivors of decedents.
> . . . .
> Examples of Essential Duties and Accountabilities
> The following examples of duties and accountabilities illustrate the general range of tasks assigned to the position but are not intended to define the limits of required duties. Other essential duties may be assigned consistent with the general scope of the position.
> 1. *Death Investigations*: Upon notice of death, the position determines whether the Coroner's office has jurisdiction. If within jurisdiction, the incumbent travels to death scenes and coordinates the investigation on-site. This includes determining probable causes, manner and times of death; photographing the scene and the decedent and includes obtaining medical records, demographic information and law enforcement records and reports as well as securing personal records, prescription medications, personal property and other evidence. This incumbent determines if autopsies are required, prepares such authorizations and assists at autopsies.

CP at 79.

Upon learning of Jerry Jasman's appointment as chief deputy coroner, Grant County Prosecuting Attorney D. Angus Lee questioned Jerry Jasman's authority to sign death certificates. In December 2010 and because of the questioning by Angus Lee, Grant County Coroner Craig Morrison created the position of investigator in the

5

coroner's office. The job description for this new position reads:

> JOB SUMMARY:
> This position's responsibilities are to assist with the investigation of deaths occurring in Grant County.
> DISTINGUISHING CHARACTERISTICS:
> The position is one of only two in the Coroner's office, working Weekends and Nights when required by the Coroner. While the focus of the job is on investigating deaths, the job also requires its incumbent to respond with respect and consideration when working with the deceased, family members and law enforcement officials.
> ESSENTIAL DUTIES AND RESPONSIBILITIES:
> The following examples of duties and accountabilities illustrate the general range of tasks assigned to the position but are not intended to define the limits of required duties. Other essential duties may be assigned consistent with the general scope of the position. Employee must comply with all County and office policies, procedures, WACs, and/or other regulatory bodies.
>
> - Responds to reports of deaths; accident, homicide, natural, suicide, and undetermined to conduct on-scene investigations to assist with determining manner, cause and time of death. Investigations may include performing thorough physical examinations of bodies and scenes, conducting interviews with witnesses, family, friends, and medical and law enforcement personnel.
> - Responsible for taking video or photographs at the scene;
> - Assists with documenting, collecting and recovering property, which is a direct part of the body. This includes the body in its intact and reasonably undisturbed state.
> - Releasing the personal property to the next-of-kin or law enforcement agency, conducting the criminal investigation after the investigation.
> - Confiscates all prescription medications and drugs for analysis by a toxicologist and/or disposal.
>      . . . .
> - Composes statements of investigations for the Coroner and other reports to support establishment of the cause and manner of death.

. . . .

- Perform other duties as assigned by the Coroner.

CP at 82. Although the job description for investigator is lengthier and fuller, one can

readily observe similarities in the role and duties of investigator to that of the former

position of deputy county coroner.

In July of 2011, Coroner Morrison asked the Washington State Department of

Health whether Jerry Jasman could complete and sign death certificates. Deputy State

Registrar Phillip Freeman responded:

> The county coroner is an elected official selected by the citizens of
> that county (RCW 36.16.030). A county official can hire a deputy and
> employees as referenced in RCW 36.16.070. I would refer you to the
> county board of commissioners and legal counsel for any further questions
> about the authority of the coroner or any staff in that office. We have no
> grounds to question death records signed by a county coroner or their
> designated deputy.

CP at 167. Morrison construed Freeman's answer as confirmation that Jasman held

authority to sign death certificates.

In a letter to the Washington Association of Coroners, Morrison claimed he

employed Jasman as his chief investigator, an at-will employee, rather than "deputizing

him as an appointed official." CP at 92. According to Craig Morrison, Jasman's duties

as an investigator included determining and certifying the cause and manner of death in

cases handled by the Grant County Coroner.

In late 2011, Grant County Undersheriff Dave Ponozzo spoke with Coroner Craig

7

Morrison. Morrison told Ponozzo that he intended for Jerry Jasman to continue to sign death certificates regardless of advice he received from the prosecutor's office.

PROCEDURE

On June 27, 2012, Grant County Prosecuting Attorney D. Angus Lee filed this quo warranto action against Jerry Jasman. Prosecutor Lee claimed Jasman unlawfully exercised the public office of coroner or deputy coroner in Grant County, and Lee asked for a "judgment of ouster" against Jasman pursuant to chapter 7.56 RCW. CP at 8. Lee averred that Jasman's conviction for disorderly conduct precluded him from serving as the Grant County Coroner or Deputy Coroner. Lee argued Jasman is not authorized to complete death certificates in Washington and death certificates signed by Jasman are invalid. Prosecutor Lee prayed for an injunction precluding Jerry Jasman from signing death certificates.

On July 19, 2012, Coroner Craig Morrison asked Grant County's Board of Commissioners for the county to indemnify Jasman for attorney fees and costs incurred in defending the quo warranto action. The Board of Commissioners initially approved Morrison's request, but subsequently reversed its decision based on legal advice from the prosecuting attorney's office.

On August 6, 2012, Jerry Jasman resigned as deputy coroner but continued as Grant County Coroner Chief Investigator. Morrison accepted Jasman's resignation and ordered him to not sign death certificates until resolution of this suit.

8

Jerry Jasman claimed that the Grant County Prosecuting Attorney Angus Lee held a conflict of interest when representing himself as plaintiff in the quo warranto action and advising the Board of Commissioners on whether to indemnify Jasman as the defendant in the suit. On September 12, 2012, Jasman moved to disqualify Lee from representing himself as plaintiff. The trial court granted this motion on October 15, 2012. Prosecutor Lee initially cross appealed this ruling, but has withdrawn his appeal as moot. On appeal, Pamela Loginsky, Staff Attorney with the Washington Association of Prosecuting Attorneys, represents Prosecutor Lee.

On October 18, 2012, Coroner Craig Morrison again asked the Grant County Board of Commissioners to indemnify Jasman. On November 7, 2012, Pierce County Deputy Prosecutor Douglas Vanscoy advised the Board on the application of RCW 4.96.041, the indemnity statute. Vanscoy wrote that, in his opinion, RCW 4.96.041 does not require Grant County to provide Jasman a defense, because he is not being sued for damages. Based on this advice, the Board denied Morrison's request.

On November 21, 2012, Coroner Craig Morrison and Jerry Jasman jointly moved to allow Morrison to intervene and for the trial court to appoint a special prosecutor to defend them. The trial court granted the motion to intervene and denied the motion for appointment of a special prosecutor.

In December 2012, Prosecutor Angus Lee, on the one hand, and Coroner Craig Morrison and Jerry Jasman, on the other hand, filed cross motions for summary judgment

9

on the merits of the quo warranto action. On February 27, 2012, the trial court granted

Lee's motion for summary judgment, ousted Jerry Jasman from the position of deputy

coroner, and enjoined Jasman from signing death certificates in Grant County.

On December 10, 2012, Jerry Jasman filed a *second* action for declaratory

judgment and alternative writs for certiorari and mandamus against Grant County and the

Grant County Commissioners. The complaint alleges that Jasman is entitled to a defense

of this first action under RCW 4.96.041, and that the county commissioner's reversal of

their decision to authorize funds for his defense is arbitrary and capricious in light of their

simultaneous authorization of funds to defend Prosecutor Angus Lee in connection with

disciplinary charges filed by the Washington State Bar Association.

In the second suit, Grant County and the county commissioners filed a motion

for summary judgment seeking dismissal of Jasman's complaint. One of the grounds

urged in support of dismissal is that the initial action filed by Lee is not, in fact, a quo

warranto action. A brief in support of the motion reads:

> *1. Lee v. Jasman* Was Not a Quo Warranto Action
> A traditional quo warranto proceeding involves contestants for an
> elective office. *Clarken v. Blomstrom,* 174 Wash. 612, 616 (1933). "[Q]uo
> warranto is the remedy by which to determine the right or title to an office,
> while mandamus is the remedy to be employed to reacquire a position for
> an employee." *State ex rel. Powell v. Fassett,* 69 Wash. 555, 558, 559
> (1912) . . . . At the time when Prosecutor Lee sued, Mr. Jasman was not
> serving as elected coroner, he was an employee of the Coroner's Office,
> *i.e.,* a subordinate and not the holder of elective office.

Prosecutor Lee's lawsuit against Mr. Jasman did not seek to oust Coroner Morrison from office, nor did it seek to remove Mr. Jasman from county employment. Rather, it requested:

> 5.3. For a preliminary and permanent mandatory and prohibitive injunction enjoining JASMAN from performing the duties of the Grant County Coroner or of a deputy coroner, including the completion and/or signing of death certificates issued in the County of Grant, State of Washington; . . . .

Ex. D5. Nor did Judge Hotchkiss order Morrison or Jasman ousted from either's position. Rather, the Court enjoined Jasman from signing death certificates. *See* Ex. K3. Whatever the form of the complaint, its substance was not quo warranto but rather that of a pleading seeking declaratory and injunctive relief, and that was the nature of the relief that was ultimately granted. "A party's characterization of the theory of recovery is not binding on the court. It is the nature of the claim that controls." *Pepper v. J.J. Welcome Const. Co.,* 73 Wn. App. 523, 546, 871 P.2d 601, *rev[iew] denied,* 124 Wn.2d 1029 (1994), *overruled on other grounds by Phillips v. King County,* 87 Wn. App. 468, 943 P.2d 306 (1997), *aff'd on other grounds, 136* Wn.2d 946 (1998).

Accordingly, *Lee* v. *Jasman* was not a quo warranto action, and RCW 7.56 has no application here.

Motion to Vacate and Dismiss Based on Judicial Estoppel and Lack of Subject Matter Jurisdiction at 4-5 (March 10, 2014) (some alterations in original) (quoting Ex. 3, at 12-13).

The Grant County Superior Court stayed Jerry Jasman's second suit and Grant County's summary judgment motion in the suit pending the outcome of this appeal.

## LAW AND ANALYSIS

## QUO WARRANTO

We first explore the nature of a quo warranto action. Quo warranto is a common law writ used to inquire into the authority by which a public office is held or a franchise

11

is claimed. BLACK'S LAW DICTIONARY 1371 (9th ed. 2009). Chapter 7.56 RCW

codifies the writ in Washington. RCW 7.56.010 reads, in relevant part:

> An information may be filed against any person or corporation in the following cases:
> (1) When any person shall usurp, intrude upon, or unlawfully hold or exercise any public office or franchise within the state, or any office in any corporation created by the authority of the state.
> (2) When any public officer shall have done or suffered any act, which, by the provisions of law, shall work a forfeiture of his or her office.

Although another interested in a public office may file a quo warranto action, the

county prosecuting attorney also has standing to file the action. RCW 7.56.020; *State ex*

*rel. Brown v. Warnock*, 12 Wn.2d 478, 482, 122 P.2d 472 (1942). RCW 7.56.100

outlines the authority of the trial court in a quo warranto action:

> Whenever any defendant shall be found guilty of any usurpation of or intrusion into, or unlawfully exercising any office or franchise within this state, . . . the court shall give judgment of ouster against the defendant or defendants, and exclude him, her, or them from the office, [or] franchise, . . . and the court shall adjudge costs in favor of the plaintiff.

If Jerry Jasman had insisted on staying in office as Grant County Coroner, a quo

warranto proceeding could have readily removed him from office because of his

conviction of a felony and the provisions of RCW 9.92.120 demanding forfeiture of a

public office upon conviction. *State ex rel. Carroll v. Simmons*, 61 Wn.2d 146, 377 P.2d

421 (1962), *cert. denied, Simmons v. Washington,* 374 U.S. 808, 83 S. Ct. 1698, 10

L.Ed.2d 1032 (1963); *In re Simmons*, 65 Wn.2d 88, 395 P.2d 1013 (1964), *cert. denied,*

*Simmons v. Washington,* 381 U.S. 934, 85 S. Ct.1764, 14 L. Ed. 2d 699 (1965). A quo

12

warranto proceeding is merely ancillary to and in aid of, and not condition precedent to, immediate forfeiture and vacancy created in public office when an officeholder is convicted of a felony. *Simmons*, 65 Wn.2d at 88. Jasman would have then unlawfully held or exercised a public office in violation of RCW 7.56.010 and .100. Instead, after resigning as Grant County Coroner, Jasman returned to the office as chief deputy coroner with power to sign death certificates, and we must decide whether he is precluded from this office or from performing this task.

We should outline the contentions and desires of the parties before framing the issues, since the arguments and wishes direct our rulings. Although the Grant County Prosecuting Attorney does not believe Jerry Jasman should hold any public employment, Prosecutor Lee does not seek to prevent Jasman from working as a chief investigator, as long as Jasman does not sign death certificates. Lee also does not want Jasman to hold the title of deputy coroner. Jerry Jasman and Craig Morrison believe that Jasman may lawfully perform any function of the county coroner as long as his performance is under the supervision of Morrison. To the extent he may only sign death certificates if he holds the title of deputy coroner, Jasman seeks to hold this title. The superior court's order ousts and prohibits Jerry Jasman from "[e]xercising the Office of Grant County Coroner or Deputy Coroner." CP at 294. The order also enjoins Jasman from signing death certificates issued in Grant County.

With these contentions and desires in mind, we focus now on RCW 9.92.120, the

13

forfeiture statute, to determine if Jasman's role and duties label him as a "public officer" under the statute. The quo warranto action statute only provides the procedure to follow in this case. RCW 9.92.120 provides the substantive answer to whether Jerry Jasman may serve as deputy coroner and sign death certificates. After reviewing RCW 9.92.120, we explore the nature of being a deputy officer and of signing death certificates.

RCW 9.92.120

RCW 9.92.120 reads:

> The conviction of a public officer of any felony or malfeasance in office shall entail, in addition to such other penalty as may be imposed, the forfeiture of his or her office, and shall disqualify him or her from ever afterward holding any public office in this state.

The legislature adopted RCW 9.92.120 in 1909 and the statute has undergone no substantive changes. With the statute, the legislature seeks to "promote uprightness in public affairs." *Matsen v. E. C. "Ez" Kaiser*, 74 Wn.2d 231, 443 P.2d 843 (1968). Washington recognizes an inherent danger to the body politic if a criminal exercises the powers of government. *Matsen*, 74 Wn.2d at 235; 63C AM. JUR.2D *Public Officers and Employees* § 75 (2014) further expresses reasons for public office forfeiture statutes:

> Provisions prohibiting persons committing crimes from holding public office are intended to assure the requisite good character of those individuals whom citizens look to for governance, to promote honesty and integrity in candidates for, and holders of, public office, and to preserve public confidence in government, to prevent dishonesty involving the public resources, and to prevent the use of public office for private gain.

Vacancy in or removal from office as a result of a conviction of a public officer is

14

not a punishment. *State ex rel. Zempel v. Twitchell*, 59 Wn.2d 419, 430, 367 P.2d 985 (1962). Removal from office is simply a consequence of a reasonable and sound public policy, and a condition imposed upon a public official in furtherance of the public interest in good government. *Twitchell*, 59 Wn.2d at 430. Officers are elected not for their benefit, but for the benefit of the community. *Id.* A public official convicted of any offense involving a violation of his official oath should not hold a position of public trust. *Id.*

We focus on RCW 9.92.120's directive that "the conviction of a public officer . . . shall disqualify him . . . from ever afterward holding any public office." To resolve the appeal we must determine whether the position of deputy county coroner is a "public office" within the meaning of the forfeiture statute. We must also determine if the function of signing death certificates constitutes the "holding" of "public office" within the meaning of the statute. RCW 9.92.120 does not define the terms "public office" or "public officer."

A half dozen cases, most of them inapposite, apply RCW 9.92.120, usually in the context of a quo warranto action brought to remove a government employee or official. In *Matsen*, 74 Wn.2d 231, Klickitat County Sheriff E. C. Kaiser resigned from office after pleading guilty to misappropriating public records. The criminal court entered a deferred sentence and, after six months, dismissed the charges. The State Supreme Court held that dismissal of the charges created a clean record such that Kaiser was no longer

15

disqualified from serving as sheriff. He won reelection.

In *Twitchell*, 59 Wn.2d 419, Snohomish County Sheriff Robert Twitchell was convicted of permitting the keeping of a house of prostitution. The Supreme Court agreed that RCW 9.92.120 directed summary removal of Twitchell from office upon his conviction. Twitchell's appeal of the conviction did not stay his removal.

In *State ex rel. Guthrie v. Chapman*, 187 Wash. 327, 60 P.2d 245 (1936), Pierce County Commissioner Calvin Guthrie was removed from office by a quo warranto action after his conviction for grand larceny. The Supreme Court refused to vacate the removal after the criminal conviction was overturned on appeal. The removal from one's current office upon a conviction was automatic and irreversible, although Guthrie might qualify to serve in another office or be reelected to the same office after the criminal conviction's reversal.

In *Simmons*, 61 Wn.2d 146, the court affirmed the removal, by a quo warranto action, of a municipal judge after his conviction for assault in the second degree. In *State ex rel. Knabb v. Frater*, 198 Wash. 675, 89 P.2d 1046 (1939), the court affirmed the ouster, by quo warranto action, of the Bremerton Mayor after his conviction for conspiracy to operate a gambling operation and attempting to bribe the county prosecuting attorney to forego enforcing gaming laws.

All cases discussed above involve removal of an elected official. As chief deputy coroner, Jerry Jasman was not an elected official and he argues the forfeiture statute

16

should apply only to an elected officer. Nevertheless, one Washington decision extends the claws of RCW 9.92.120 to an unelected official. In *Hoflin v. City of Ocean Shores*, 121 Wn.2d 113, 847 P.2d 428 (1993), Ocean Shores fired director of public works Douglas Hoflin after his conviction in federal court of the felony of disposing of hazardous waste and the misdemeanor of disposing kitchen sludge. The termination occurred after the city attorney advised the city manager that RCW 9.92.120 extended to public offices "whether elected or appointed." Hoflin filed a wrongful discharge suit and argued that RCW 9.92.120 did not apply to him because he was not an elected public officer. The city argued to the contrary, but the trial court granted Ocean Shores' summary judgment on other grounds—Hoflin was an "at will" employee and the city held just cause for his dismissal under its municipal code. The Court of Appeals reversed and remanded for a trial on the ground that state law and a city ordinance created an issue of fact as to whether Hoflin held an expectation that he would be fired only for just cause and there was an issue of fact of just cause. This court refused to address Ocean Shores' contention that RCW 9.92.120 demanded removal from office, because the city did not cross appeal the trial court's refusal to grant judgment on that ground.

The Washington Supreme Court, in *Hoflin*, devoted much of its opinion to the procedural question of whether Ocean Shores could rely on RCW 9.92.120 in the Court of Appeals, and, in turn, before the Supreme Court. The Supreme Court ruled that the city could. The court further ruled that RCW 9.92.120 mandated forfeiture of Hoflin's

17

office upon his conviction of a federal felony. The court did not analyze whether RCW 9.92.120 applied to an unelected official but its holding necessarily answered the question affirmatively.

## RCW 9A.04.110(13)

RCW 9A.04.110 provides a definition of "public office" and "officer" that undermines Jerry Jasman's argument that, as a deputy coroner, he is not a public officer. The statute reads, in pertinent part:

> In *this title* unless a different meaning plainly is required:
> . . .
> (13) "Officer" and "public officer" means a person holding office under a city, county, or state government, or the federal government who performs a public function and in so doing is vested with the exercise of some sovereign power of government, and includes all assistants, deputies, clerks, and employees of any public officer and all persons lawfully exercising or assuming to exercise any of the powers or functions of a public officer.

(Emphasis added.) "This title" would at least refer to Title 9A RCW. Title 9, in which RCW 9.92.120 lies, is a related title, with Title 9 being "Crimes and Punishments" and Title 9A being the "Washington Criminal Code." We will later address the use of RCW 9A.04.110 when divining the meaning of "public officer" for purposes of RCW 9.92.120. For now, we note that both code sections derive from the same 1909 enactment. The legislature first enacted the provisions that became RCW 9.92.120 and RCW 9A.04.110(13) together in 1909. *See* LAWS OF 1909, ch. 249, §§ 37, 51.

## PUBLIC OFFICE

18

We now turn our attention to cases that construe the meaning of "public office" or its related term "public officer" in contexts other than RCW 9.92.120. Because of the importance placed on the decisions by the parties, we address, in chronological order, each case at some length.

Our first decision, upon which Jerry Jasman heavily relies is *Nelson v. Troy*, 11 Wash. 435, 39 P. 974 (1895). Henry Nelson sued to restrain Clallam County Auditor John Troy from issuing a warrant upon the county treasurer for payment of services to a deputy county clerk. Nelson argued that an 1890 statute, authorizing county commissioners to allow county officer deputies and to fix their compensation is invalid, as an attempt upon the part of the legislature to delegate to county commissioners the exercise of powers exclusively legislative. Washington CONST. art. 11, § 5 provides: "The legislature . . . shall provide for the election in the several counties of boards of county commissioners, sheriffs, county clerks, treasurers, prosecuting attorneys, and other county, township or precinct and district *officers*, as public convenience may require, and shall prescribe their duties and fix their terms of office." (emphasis added). The 1890 enactment read, in relevant part: "And in all cases where the duties of any office are greater than can be performed by the person elected to fill the same, said officer may employ, with the consent of the county commissioners, the necessary help, who shall receive a just and reasonable pay for services." *Nelson*, 11 Wash. at 438.

Washington's Supreme Court, in *Nelson*, narrowly phrased the issue as: what is

19

meant by the term "officer" used in the section of the constitution? The court held that a deputy of an elected officer is not an "officer" for purposes of the constitutional provision. The constitution only directed the legislature to regulate the election, duties and compensation of elected officers. Thus, the county commissioners may regulate the duties and compensation of deputies. The court reasoned that an "officer" is distinguished from an employee by the greater importance, dignity, and independence of his position; in being required to take an official oath and give an official bond; in the liability to be called to account as a public officer for misfeasance or nonfeasance in office; and usually, though not necessarily, in the tenure of his position. The court, however, recognized that in other settings the term "officer" could include a deputy. The court did not wish to give a broad construction of the term because rules of construction direct a court to construe a statute to uphold its constitutionality.

The next case upon which Jerry Jasman relies, *Bilger v. State*, 63 Wash. 457, 116 P. 19 (1911), does little to answer the question before us. The plaintiff argued that commission members appointed by a municipality to assess the benefits accruing to land as the result of a public improvement must be elected by reason of the same constitutional provision at issue in *Nelson*. Thus, plaintiff argued that the commission members were "officers" within the meaning of the provision. The court disagreed, reasoning that commissioners appointed by a municipality to make an assessment of benefits were not officers of the municipality, since, generally speaking, an officer is one

20

employed on behalf of the government in some fixed and permanent capacity, not in a capacity merely transient, occasional or incidental. Jerry Jasman is a permanent employee, although he may be fired at will, with fixed and ongoing duties.

In *State ex rel. Bd. of D.S.D. No. 306 v. Preston*, 120 Wash. 569, 208 P. 47 (1922), the court stated that a public school teacher was an employee, not an officer. The question was whether a teacher needed to be given a hearing before discharge from his position. Characterizing a teacher as an officer, or employee, was unimportant to the decision.

The next decision addressing who may be considered a "public officer" is *State ex rel. Scofield v. Easterday*, 182 Wash. 209, 46 P.2d 1052 (1935). Relators sought to preclude the county engineer from hiring an assistant despite a statute authorizing the employment of an assistant. The relators argued that the statute was unconstitutional because the legislature sought to allow the county engineer authority to create a new "public office." The Supreme Court disagreed, ruling that an assistant was not an "officer." *Scofield* follows the teaching of *Nelson* and aids Jerry Jasman's case.

In *State ex rel. McIntosh v. Hutchinson*, 187 Wash. 61, 59 P.2d 1117 (1936), the court addressed whether L. E. Tewksbury, the state Director of the United States Works Progress Administration (WPA.) could serve as a state senator. Our constitution prohibited a member of the legislature to also "be appointed to any other office, civil or military, under the government of the United States." CONST. art. II, § 14. The court

21

distinguished between an officer and an employee and asked, what is a "civil office" within the meaning of the constitutional provision? Relying on a Montana decision, the state high court outlined five factors and declared that for "a public office" to be

> of a civil nature: (1) it must be created by the Constitution or by the legislature or created by a municipality or other body through authority conferred by the legislature; (2) it must possess a delegation of a portion of the sovereign power of government, to be exercised for the benefit of the public; (3) the powers conferred, and the duties to be discharged, must be defined, directly or impliedly, by the legislature or through legislative authority; (4) the duties must be performed independently and without control of a superior power, other than the law, unless they be those of an inferior or subordinate office, created or authorized by the legislature, and by it placed under the general control of a superior officer or body; [and] (5) it must have some permanency and continuity, and not be only temporary or occasional.

*McIntosh*, 187 Wash. at 63-64. In addition, an "officer" must take and file an official oath, hold a commission or other written authority, and give an official bond, if the latter be required by proper authority. *McIntosh*, 187 Wash at 64.

Based upon the five factors, the Supreme Court in *McIntosh*, ruled that Tewksbury was not a "civil officer" and could serve as state senator. Federal legislation created no district or divisional office for the administration of the WPA. Hence, there was no office of manager of the state of Washington for the administration of the WPA, and Tewksbury became no more than an employee. Nothing in the record showed that any sovereign power was conferred by Tewksbury. Tewksbury had no duties to perform

22

independently and without the control of his superior. Nothing indicated permanency or continuity of his position.

We assume that the term "civil office" used in *McIntosh* holds the same meaning as the term "public office" in RCW 9.92.120. We also assume that the State Supreme Court intended for courts to employ the five factors when determining whether a government position is a public office for some purposes other than serving as a state legislature. Nonetheless, some questions arise from the *McIntosh* decision. The court did not state whether all five factors must be met before declaring a position to be a public office. The court did not answer whether the trial court should weigh the five factors and whether the reviewing court should give some deference to the trial court's weighing of the factors.

In *State ex rel. Brown v. Blew*, 20 Wn.2d 47, 145 P.2d 554 (1944), a court reporter sued the county auditor for payment of his services. The auditor declined to issue a warrant for services based upon a constitutional provision that prohibited "the compensation of any public officer be increased or diminished during his term of office." CONST. art. II, § 25. The question for the court on appeal was whether a court reporter of a superior court is a "public officer?" The court answered in the negative.

The Supreme Court, in *Brown*, noted the difficulty of creating a working definition for "public officer" particularly when the term is used in varying contexts. The court noted:

23

[T]ext writers and courts have found it difficult, if not impossible, to formulate a definition of a "public officer" that will be general in its application, but have been content to recognize certain fundamental principles and tests which have served as a guide in determining whether one, in a particular situation, is a public officer.

Because of the variety of meanings or shades of meaning in which the terms "office" and "officer" may be employed, in determining whether or not a given employment is an office within the meaning of a particular statute or other written law, each case must be determined by a consideration of the particular facts and circumstances involved, and of the intention and subject matter of the enactment. The nature of the duties, the particular method in which they are to be performed, the end to be attained, the depositary of the power conferred, and the whole surroundings, must all be considered when the question as to whether a position is a public office or not is to be solved.

The distinguishing characteristic of a public officer is that the incumbent, in an independent capacity, is clothed with some part of the sovereignty of the state, to be exercised in the interest of the public as required by law.

*Brown*, 20 Wn.2d at 50-51.

Thus the *Brown* court emphasized an intensive case by case inquiry as to whether a position constitutes a "public office." The court then repeated the Montana five factor test employed in *McIntosh*.

The *Brown* court ruled that a court reporter was not a public officer based upon many factors. There were no powers conferred upon the court reporter nor were her duties defined by statute. She performed no duties independent of the direction of a judge. She could be removed by the judge for incompetency, misconduct, or neglect of duty.

*State ex rel. Hamblen v. Yelle*, 29 Wn.2d 68, 185 P.2d 723 (1947), addressed the

24

same question as addressed in *McIntosh*. Herbert Hamblen, a member of the state legislature, sought to compel the state auditor to pay his expenses incurred when serving on the state legislative council. The auditor refused to pay, claiming Hamblen as a member of the legislature was disqualified from serving upon the legislative council, because such membership constituted a "civil office," which the state constitution barred a legislator from holding. The Supreme Court disagreed. The court held that all five elements of the Montana test must be fulfilled before a position is considered an "office." The members of the legislative council were not delegated sovereign functions, the second of the elements.

In *In re Lewis*, 51 Wn.2d 193, 316 P.2d 907 (1957), the court addressed the term "county officer" found in RCW 36.27.020(2), which directs the prosecuting attorney to advise "all county and precinct officers." Although a probation officer is not elected, the court held that he is a "county officer." *Lewis*, 51 Wn.2d at 201.

In *Smith v. Bd. of Walla Walla County Comm'rs*, 48 Wn. App. 303, 738 P.2d 1076 (1987), the court held that a county commission budget director was not an "officer" under RCW 36.22.110, which prohibits a "county officer" from performing the duties of a county auditor. The court characterized an "officer" as one who exercised sovereign power or discretionary functions. 48 Wn. App. at 309. The court also held that a budget director is not a deputy officer. It relied on the definition in Black's Law Dictionary of a "deputy" as: "[a] substitute; a person duly authorized by an officer to exercise some or all

25

of the functions pertaining to the office, in the place and stead of the latter." BLACK'S

LAW DICTIONARY 529 (4th rev. ed. 1968). In 1976, Webster's defined deputy as: "a

person appointed, nominated, or elected as the substitute of another and empowered to

act for him, in his name, or in his behalf . . . a second in command or an assistant who

usually takes charge when his superior is absent." WEBSTER'S THIRD NEW

INTERNATIONAL DICTIONARY 607 (1976). Finally, the court noted that, under RCW

36.16.070, a deputy may perform any act which his principal is authorized to perform. A

broad reading of *Smith* suggests that a deputy of an elected officer is a public officer.

In *State v. Korba*, 66 Wn. App. 666, 832 P.2d 1346 (1992), Juanita Korba

appealed her conviction for injury to or misappropriation of a record on the ground she

was not a "public officer" under RCW 40.16.020. The statute punished "every officer

who shall mutilate, destroy, conceal, erase, obliterate or falsify any record or paper

appertaining to [his office]." RCW 40.16.020. The Tacoma–Pierce County Department

of Health employed Korba in its vital records office where the county recorded birth and

death certificates. A sting operation showed that Korba threw away written requests for

copies of certificates and pocketed money paid for the copies.

The trial court, in *Korba*, instructed the jury that, for purposes of RCW 40.16.020:

> Officer and public officer means [sic] a person holding office under
> a city, county, or state government, who performs a public function and in
> so doing is vested with the exercise of some sovereign power of
> government, and includes all assistants, deputies, clerks, and employees of
> any public officer and all persons lawfully exercising or assuming to

exercise any of the powers or functions of a public officer.

*Korba*, 66 Wn. App. at 669. This instruction comes from the language in

RCW 9A.04.110(13) mentioned above.

Relying upon civil cases upon which Jerry Jasman relies, Juanita Korba contended

that the trial court erred by ignoring the common law definition of a public officer, which

was more restrictive than given by the trial court. Korba claimed that, under the common

law, neither a deputy nor an employee is a public officer, citing *Nelson*.

The *Korba* court answered that *Nelson* and other decisions do not apply in the

criminal context. The court then examined the legislative history behind RCW

9A.04.110(13) to explain why. Korba falsely assumed that the legislature adopted the

criminal definition found in RCW 9A.04.110 in 1975 and, therefore, could not have

intended for it to apply to crimes enacted in 1909. Nevertheless, the 1909 legislature

passed chapter 249, entitled "Criminal Code." LAWS OF 1909, ch. 249. Subchapter 1, §

51, a definition section of the bill, defined "public officer" as "includ[ing] all assistants,

deputies, clerks and employees of any public officer and all persons exercising or

assuming to exercise any of the powers or functions of a public officer." The legislature

later recodified the definition section as RCW 9.01.010, which the legislature repealed by

LAWS OF 1975, 1st Ex. Sess., ch. 260, and enacted as RCW 9A.04.110(13). The 1909

legislature also enacted the language criminalizing "[i]njury to and [m]isappropriation of

[public] record[s]" later codified at RCW 40.16.020. LAWS OF 1909, ch. 249, § 96. The

27

*Korba* court concluded that the 1909 legislature intended for the criminal code definition of "public officer" to apply to the public records provisions as it was part of the same legislative act.

RCW 9.92.120, the public officer forfeiture statute, is also a section of the 1909 bill. Laws of 1909, ch. 249, § 37. The bill was also adopted after the 1895 decision in *Nelson*. *Korba* illustrates that the definition of "public officer" in RCW 9A.04.110(13) extends beyond Title 9A, since *Korba* involved the interpretation of RCW 40.16.020.

## COUNTY CORONER AND HIS DEPUTY

The county coroner plays a critical role in American life and death. The coroner holds wide powers when a sudden or suspicious death occurs. Those powers include taking possession of the body and studying the remains of the decedent. She or he is authorized to determine the legal cause of someone's death. The coroner engages in communication with the decedent's family during an emotional and anxious time.

In Washington State, RCW Chapter 36.24 controls the office of county coroner, although the quintessential role and paramount duty of a county coroner in handling human remains and investigating deaths is delineated in RCW Chapter 68.50. RCW 68.50.010 reads:

> The jurisdiction of bodies of all deceased persons who come to their death suddenly when in apparent good health without medical attendance within the thirty-six hours preceding death; or where the circumstances of death indicate death was caused by unnatural or unlawful means; or where death occurs under suspicious circumstances; or where a coroner's autopsy

28

or postmortem or coroner's inquest is to be held; or where death results from unknown or obscure causes, or where death occurs within one year following an accident; or where the death is caused by any violence whatsoever, or where death results from a known or suspected abortion; whether self-induced or otherwise; where death apparently results from drowning, hanging, burns, electrocution, gunshot wounds, stabs or cuts, lightning, starvation, radiation, exposure, alcoholism, narcotics or other addictions, tetanus, strangulations, suffocation or smothering; or where death is due to premature birth or still birth; or where death is due to a violent contagious disease or suspected contagious disease which may be a public health hazard; or where death results from alleged rape, carnal knowledge or sodomy, where death occurs in a jail or prison; where a body is found dead or is not claimed by relatives or friends, is hereby vested in the county coroner, which bodies may be removed and placed in the morgue under such rules as are adopted by the coroner with the approval of the county commissioners, having jurisdiction, providing therein how the bodies shall be brought to and cared for at the morgue and held for the proper identification where necessary.

Because of her jurisdiction over a dead body, the county coroner may direct the transportation of the remains and charge the costs to the county. RCW 68.50.032. The coroner and his assistants must compile a list of jewelry, money, papers, and other personal property found with the deceased and the original of the list must be kept as a public record. RCW 68.50.040. The coroner must, within 30 days after the investigation of the death, deliver to the county treasurer any money found upon the body, unless claimed in the meantime by the legal representatives of the deceased. RCW 36.24.130. If there is other personal property found upon the body, unless claimed in the meantime by a legal representative of the deceased, the coroner shall, within one hundred eighty days of the investigation, dispose of any property of no resale value and forward any

29

other property to the applicable county agency to be sold at the next county surplus sale. RCW 36.24.130.

The county coroner holds the prerogative to order an autopsy of a decedent. RCW 68.50.101(6). He or she must conduct an autopsy if requested by the family. *Ryan v. Zornes*, 34 Wn. App. 63, 658 P.2d 1281 (1983). The coroner shall keep an autopsy report confidential, except that she must speak to the family about her findings if requested by the family. RCW 68.50.105. The county coroner may conduct an investigation into a person missing for 30 days under suspicious circumstances, and, if so, must (1) file a missing person's report with the Washington State Patrol Missing and Unidentified Persons Unit, (2) initiate the collection and testing of DNA samples from the known missing person and his family members, and (3) ask the missing person's family to give written consent to contact the dentist of the missing person and request the person's dental records. RCW 68.50.320.

When determining the cause of death, a coroner may summon an inquest jury. RCW 36.24.020 provides, in part:

> Any coroner, in his or her discretion, may hold an inquest if the coroner suspects that the death of a person was unnatural, or violent, or resulted from unlawful means, or from suspicious circumstances, or was of such a nature as to indicate the possibility of death by the hand of the deceased or through the instrumentality of some other person . . . .
> The coroner in the county where an inquest is to be convened pursuant to this chapter shall notify the superior court to provide persons to serve as a jury of inquest to hear all the evidence concerning the death and to inquire into and render a true verdict on the cause of death. Jurors shall

30

be selected and summoned in the same manner and shall have the same qualifications as specified in chapter 2.36 RCW.

The county coroner possesses other critical powers. The coroner shall perform the duties of the sheriff in all cases where the sheriff is an interested party or otherwise incapacitated from serving. RCW 36.24.010. Whenever the coroner acts as sheriff, he or she shall possess the powers and perform all the duties of the sheriff. RCW 36.24.010. The county coroner shall also control and manage any public morgue. RCW 68.52.020. The coroner shall monthly report the death of any person as a result of a vehicle accident to the county sheriff and to the Washington State Patrol. RCW 46.52.050.

In the event of a sudden or mysterious death of any patient in a state hospital, the hospital must report the death to the county coroner. RCW 72.23.190. The county coroner shall entrust a decedent's body to a funeral home, when no one else has provided for burial. RCW 36.24.155.

We list the vital functions of a county coroner because state law allows a deputy county coroner to assume these duties. Also, the job descriptions for Jerry Jasman, first as a chief deputy coroner, and, second as chief investigator, track the statutory functions. "Ordinarily a deputy is spoke of as an officer as distinguished from a mere employee, especially where his or her position is by virtue of statute and where his or her duties are prescribed by law." 3 EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 12:62, at 317 (3d ed. 2014).

31

RCW 36.16.070 authorizes the hiring of deputies of county elected officers. Some of the decisions we have reviewed addressed this statute. The statute reads:

> In all cases where the duties of any county office are greater than can be performed by the person elected to fill it, the officer may employ deputies and other necessary employees with the consent of the board of county commissioners. The board shall fix their compensation and shall require what deputies shall give bond and the amount of bond required from each. . . .
>
> A deputy may perform any act which his or her principal is authorized to perform. The officer appointing a deputy or other employee shall be responsible for the acts of his or her appointees upon his or her official bond and may revoke each appointment at pleasure.

Thus, at Craig Morrison's direction, Jerry Jasman may perform any act the Grant County Coroner is authorized to perform.

RCW 36.16.060, the succeeding statute, reads:

> Every county officer, before entering upon the duties of his or her office, shall file his or her oath of office in the office of the county auditor and his or her official bond in the office of the county clerk: PROVIDED, That the official bond of the county clerk, after first being recorded by the county auditor, shall be filed in the office of the county treasurer.
>
> Oaths and bonds of deputies shall be filed in the offices in which the oaths and bonds of their principals are required to be filed.

Although he failed to file the oath with the county auditor, Jerry Jasman signed an oath upon assuming the position of deputy coroner.

Describing the scope of a deputy's authority, McQuillin writes:

> In general, a deputy has power to do every act which the principal might do. . . . The general rule is that ministerial acts which are required by statute to be performed by a particular officer are valid if performed by the deputy of such officer.

No. 31519-3-III
*Lee v. Jasman*

*McQuillin*, 12:62, *supra*, at 318.

## DEATH CERTIFICATES

In addition to ousting Jerry Jasman from the office of deputy coroner, the trial

court enjoined Jerry Jasman from signing death certificates. We, therefore, review the

county coroner's role in signing the certificates.

RCW 70.58.170 empowers county coroners to prepare death certificates. The

coroner signs the death certificate if the decedent had no medical attendant. The statute

reads:

> The funeral director or person having the right to control the disposition of
> the human remains under RCW 68.50.160 [Coroner] shall file the
> certificate of death. In preparing such certificate, the funeral director or
> person having the right to control the disposition of the human remains
> under RCW 68.50.160 shall obtain and enter on the certificate such
> personal data as the certificate requires from the person or persons best
> qualified to supply them. He or she shall present the certificate of death to
> the physician, physician's assistant, or advanced registered nurse
> practitioner last in attendance upon the deceased, or, if the deceased died
> without medical attendance, to the health officer, medical examiner,
> *coroner*, or prosecuting attorney having jurisdiction, *who shall certify the
> cause of death according to his or her best knowledge and belief* and shall
> sign or electronically approve the certificate of death.

(emphasis added).

RCW 70.58.180 authorizes a county coroner to investigate and opine for legal

purposes the cause of death. The statute reads:

> If the death occurred without medical attendance, the funeral director or
> person having the right to control the disposition of the human remains
> under RCW 68.50.160 shall notify the *coroner*, medical examiner, or

33

prosecuting attorney if there is no coroner or medical examiner in the county. If the circumstances suggest that the death . . . was caused by unlawful or unnatural causes or if there is no local health officer with jurisdiction, the *coroner* or medical examiner, or the prosecuting attorney shall complete and sign or electronically approve the certification, noting upon the certificate that no physician, physician's assistant, or advanced registered nurse practitioner was in attendance at the time of death. In case of any death without medical attendance in which there is no suspicion of death from unlawful or unnatural causes, the local health officer or his or her deputy, the *coroner* or medical examiner, and if none, the prosecuting attorney, shall complete and sign or electronically approve the certification, noting upon the certificate that no physician, physician's assistant, or advanced registered nurse practitioner was in attendance at the time of death, and noting the cause of death without the holding of an inquest or performing of an autopsy or postmortem, but from statements of relatives, persons in attendance during the last sickness, persons present at the time of death or other persons having adequate knowledge of the facts.

*The cause of death, the manner and mode in which death occurred, as noted by the coroner* or medical examiner, or if none, the prosecuting attorney or the health officer and incorporated in the death certificate filed with the department *shall be the legally accepted manner and mode by which the deceased came to his or her death and shall be the legally accepted cause of death.*

(Emphasis added.)

Grant County Prosecuting Attorney D. Angus Lee filed this quo warranto action out of concern that Jerry Jasman was signing death certificates and the legality of his signing the certificates. This concern is legitimate. In *State v. Bradfield*, 29 Wn. App. 679, 630 P.2d 494 (1981), a murder prosecution, the trial court's refusal to admit a certified copy of the death certificate was affirmed on appeal. There were additional reasons for rejecting the certificate's admission, but the court also denied admission

because the certificate had not been signed by the coroner or prosecuting attorney as required by RCW 70.58.180.

Jerry Jasman emphasizes that the State Department of Health wrote that it will accept death certificates signed by him. But acceptance by the Department of Health does not necessarily mean a trial court will admit the certificate of death. Jasman also ignores that portion of the letter from the Department of Health that encourages County Coroner Craig Morrison to seek advice from the county commissioners or legal counsel as to the legalities of Jasman's signing of certificates.

In oral argument, Jerry Jasman and Craig Morrison also recited the de facto official doctrine and contended the doctrine would allow admission of death certificates signed by Jerry Jasman even if he lacked legal authority. Under the doctrine, "'a person duly appointed to a public office is a de facto officer. . . . As such his official acts are not subject to collateral attack.'" *State v. Tracer*, 173 Wn.2d 708, 721, 272 P.3d 199 (2012) (quoting *State v. Carroll*, 81 Wn.2d 95, 108, 500 P.2d 115 (1972)). The rule assumes that the officer was duly appointed, and we question whether, under these circumstances, Jerry Jasman would be considered duly appointed to the position of deputy coroner.

Even if a court admits a death certificate signed by Jerry Jasman, Jasman's credibility and the document's validity could be challenged by defense counsel because of Jasman's conviction and questionable status as a public officer. The prosecuting attorney would prefer death certificates not be subject to these challenges. Grant County

35

and the State of Washington are served best by the lack of holes in evidence during an important murder trial. The certified cause of death by a coroner could be critical evidence during a murder trial.

## JERRY JASMAN'S DISQUALIFICATIONS

After having reviewed the quo warranto statute, the public office forfeiture statute, the definition of "public office" for criminal law, cases addressing the meaning of the term "public office," the purposes behind forfeiture of public office, the nature of the office of county coroner, the function of a deputy official, and the criminal misbehavior of Jerry Jasman, we affirm the trial court's order of ouster and injunction. Jerry Jasman is disqualified from serving as a deputy county coroner and from signing death certificates.

The rule in *Nelson* declaring that a deputy is not a county officer and the Montana five-element test of what constitutes a "public office" is of limited importance to us since the pending action is not a civil contest. Although a quo warranto action is not a criminal prosecution, the action against Jerry Jasman addresses the consequences of his criminal conviction. Contrary to some of the cases upon which Jerry Jasman relies, we are not faced with declaring a statute unconstitutional if we give a broad definition to "public office."

*State v. Korba* is the decision most apt to the circumstances before us. Although Korba was not charged with a crime listed in Title 9A RCW, the court employed the

36

definition of "public office" found in RCW 9A.04.110(13). The forfeiture statute at issue here is found in Title 9 RCW, closer in relation than Title 40 RCW, at issue in *Korba*, to Title 9A. As deputy coroner, Jerry Jasman would hold a position of higher authority and power than that held by Juanita Korba. RCW 9.92.120 arises from the same 1909 act that created the definition of "public office" found in RCW 9A.04.110(13). The Supreme Court decision, *Hoflin*, 121 Wn.2d 113, applies RCW 9.92.120 to one who is not an elected official. The statute does not expressly limit its grasp to "elected" officials.

Serving as county coroner or a deputy county coroner is not a right but a position of high public trust. The coroner assumes important functions of a sovereign when handling human remains and determining the legal cause of death. A Washington statute authorizes the deputy county coroner to assume these same functions. A prominent treatise declares that "being authorized to act for and in place of the principal, the deputy is a public officer." *McQuillin*, § 12:62, *supra*, at 316.

Jerry Jasman committed his crime during the course of public employment as the Grant County Coroner and when operating a county vehicle. He imprisoned, if not terrorized, another employee because she argued with him on some issue. He may have engaged in such conduct because the victim was a woman. We doubt he would have treated a man in the same fashion. Washington policy demands that he not serve in the important position of deputy coroner. Thus, he may not sign death certificates and certify the legal cause of death, a function at the core of the coroner's position.

37

A principle of law precludes one from doing indirectly what he is prohibited from doing directly. *Wash. Fed'n of State Emps., AFL-CIO, Council 28, AFSCME v. State*, 98 Wn.2d 677, 687, 658 P.2d 634 (1983). We do not base our decision on this principle, but observe that, on the same day that Craig Morrison was elected county coroner, Morrison hired Jerry Jasman as the chief deputy coroner with the authority to perform the same tasks that Jasman was precluded by statute from performing as coroner. Morrison emphasizes that no one else is qualified for the position of deputy coroner, but he provides no evidence of steps taken to hire someone else. Perhaps one qualified employee, Lynette Henson, was chased from employment at the Grant County Coroner's Office by Jasman's misconduct. Anyway, RCW 9.92.120 does not allow one convicted of a crime to serve as a public officer if no one else is qualified or available.

Neither party mentions the ramifications of the possible sudden death or incapacity of Coroner Craig Morrison. But we assume that, in either event, Jerry Jasman would become the acting or interim county coroner, since he is the only other employee in the Grant County Coroner's Office. This scenario creates additional reasons for limiting the authority of Jerry Jasman and encouraging Coroner Craig Morrison to hire someone else for his office.

We do not address whether Jerry Jasman is qualified to serve in any capacity within the Grant County Coroner's Office other than deputy coroner. Prosecuting Attorney Angus Lee does not seek to exclude Jasman from all duties. Thus, we only hold

No. 31519-3-III
*Lee v. Jasman*

that under RCW 9.92.120, Jerry Jasman is ousted from the position of deputy coroner and may not perform the essential function of signing death certificates.

SPECIAL PROSECUTOR AND ATTORNEY FEES

Jerry Jasman and Craig Morrison also appeal the trial court's refusal to appoint a special prosecuting attorney to represent them in this quo warranto action. Appointing a special prosecutor would serve no purpose now. So the question on appeal is whether Grant County should reimburse the two for attorney fees incurred before the superior court and the court of appeals? But to address the question we must determine if the trial court should have appointed a special prosecutor.

A court can only appoint a special prosecuting attorney in instances where a statute provides for such an appointment. *Westerman v. Cary*, 125 Wn.2d 277, 298, 892 P.2d 1067 (1994); *Hoppe v. King County*, 95 Wn.2d 332, 339, 622 P.2d 845 (1980); *State v. Heaton*, 21 Wash. 59, 62, 56 P. 843 (1899). RCW 36.27.030 provides:

> Disability of prosecuting attorney. When from illness or other cause the prosecuting attorney is temporarily unable to perform his duties, the court or judge may appoint some qualified person to discharge the duties of such officer in court until the disability is removed.

Under *Hoppe,* a prosecutor must have both a duty to represent an official and a disability that prevents the prosecutor from representing the official before the appointment of a special prosecutor is justified. We recognize that Angus Lee held a disability in representing Jerry Jasman and the intervenor Craig Morrison, since Lee was the party

39

forwarding the quo warranto action. So we must decide if the prosecuting attorney held a duty to represent the two in this suit.

Under RCW 36.27.020,

"The prosecuting attorney shall:
. . .
(2) Be legal adviser to all county and precinct officers . . . ;
(3) Appear for and represent the . . . county . . . in all criminal and civil proceedings in which the . . . county . . . may be a party;
(4) . . . defend all suits brought against . . . county;
. . .

RCW 36.27.020 requires the prosecuting attorney to represent the county in civil proceedings, but does not demand that the prosecuting attorney represent an officer or deputy officer in litigation. Instead, county officers have no inherent right to representation by the county prosecuting attorney. *Hoppe*, 95 Wn.2d at 340.

Jasman and Morrison claim that *Westerman*, 125 Wn.2d 277, implies a duty upon the prosecuting attorney to represent them in this litigation. *Westerman* did not hold that the prosecuting attorney has an obligation to represent a county official, but instead stated that RCW 36.27.020 was unclear on this question. The court implied that, assuming such a duty exists, it reasonably would apply to actions in which an official is sued in his official capacity, i.e., the county is the real party in interest. 125 Wn.2d at 299; *see Nye v. Kelly*, 19 Wash. 73, 52 P. 528 (1898). Any cause of action averred against an officer in his official capacity is in reality a suit against the municipality. *City of Atlanta v. Mitcham*, 325 Ga. App. 481, 751 S.E.2d 598, 600 (2013).

40

Jerry Jasman was not sued in his official capacity since Grant County was not the target of the quo warranto action. Instead, the county prosecuting attorney brought the action to benefit the county. Craig Morrison's intervention does not change the nature of the suit. His appearance did not alter the suit to one against Grant County. Morrison was not sued in his official capacity, but instead voluntarily inserted himself into the litigation. If anything, Morrison caused harm to Grant County by the hiring of one disqualified from office and further harm would fall upon the taxpayers of the county if his fees were paid by Grant County.

Coroner Morrison also argues *Osborn v. Grant County*, 130 Wn.2d 615, 926 P.2d 911 (1996), supports his position that he is entitled to payment by the county of his incurred fees. In *Osborn*, the court awarded the Grant County Clerk fees for time spent by a private attorney in providing her advice, since the prosecutor was obligated to provide her official legal advice. The prosecuting attorney declined providing advice since he had a conflict under the circumstances. The *Osborn* court, however, did not allow payment of fees to the private attorney for litigation services.

Craig Morrison has not sought payment for legal advice provided by private counsel outside the parameters of this quo warranto suit. Also, the Grant County Prosecuting Attorney provided advice to Craig Morrison when he told Morrison that Jerry Jasman could not sign death certificates. Morrison chose to ignore the advice.

41

## JUDICIAL ESTOPPEL

After oral argument, Craig Morrison and Jerry Jasman, under RAP 2.5(a)(1), moved to dismiss this *first* action on the grounds of judicial estoppel and lack of subject matter jurisdiction, vacate the injunction entered below, and for an award of attorney fees and costs. Jasman and Morrison focus on Grant County's claim in the declaratory judgment action brought by them—the *second* lawsuit—that this first lawsuit is not a quo warranto action. Morrison and Jasman argue that if Grant County's claim that "*Lee v. Jasman* was not a quo warranto action" is true, then this court lacks subject matter jurisdiction. They thus ask this court to judicially estop Angus Lee from invoking subject matter jurisdiction under Washington's quo warranto statutes.

RAP 2.5(a) reads, in pertinent part:

> (a) Errors Raised for First Time on Review. The appellate court may refuse to review any claim of error which was not raised in the trial court. However, a party may raise the following claimed errors for the first time in the appellate court: (1) lack of trial court jurisdiction. . . . A party or the court may raise at any time the question of appellate court jurisdiction.

Lack of subject matter jurisdiction and judicial estoppel are distinct concepts. Presumably, we could rule that judicial estoppel applies but its application does not annul subject matter jurisdiction. Thus, we could rest our decision on either theory. We rule that judicial estoppel does not control, so we do not address subject matter jurisdiction.

Judicial estoppel prevents a party from asserting one position in a judicial

proceeding and later taking an inconsistent position to gain an advantage. *Ashmore v. Estate of Duff*, 165 Wn.2d 948, 951, 205 P.3d 111 (2009); *Arkison v. Ethan Allen, Inc.*, 160 Wn.2d 535, 538, 160 P.3d 13 (2007). The doctrine seeks to preserve respect for judicial proceedings and to avoid inconsistency, duplicity, and waste of time. *Cunningham v. Reliable Concrete Pumping, Inc.*, 126 Wn. App. 222, 225, 108 P.3d 147 (2005); *Johnson v. Si-Cor, Inc.*, 107 Wn. App. 902, 906, 28 P.3d 832 (2001). Three factors inform whether judicial estoppel should apply:

> (1) whether a party's later position is clearly inconsistent with its earlier position; (2) whether judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Arkison*, 160 Wn.2d at 538-39 (citations omitted) (internal quotation marks omitted). The doctrine of judicial estoppel protects the integrity of the judicial process, not the interest of a defendant attempting to avoid liability. *Miller v. Campbell*, 164 Wn.2d 529, 544, 192 P.3d 352 (2008).

We do not address whether Angus Lee, the party to the first suit, is the same party as Grant County and the county commissioners, in the second suit. We do not address whether judicial estoppel applies to a legal position as opposed to a statement of fact. Nor do we ask whether Angus Lee's position in this suit is inconsistent with Grant County's position in the second suit, because we rule that Morrison and Jasman filed

43

their motion in the wrong action and with the wrong court.

We find no decision that directly holds that judicial estoppel cannot be raised in the first of the two suits. Nevertheless, the doctrine impliedly applies only within the context of the second suit because of an inconsistent expression in the first suit. Here, Jasman and Morrison seek to apply the doctrine in the first suit and to preclude the first expression of the purported inconsistent statement rather than the second expression of the statement.

The doctrine of judicial estoppel recognizes an order of events. The doctrine of judicial estoppel typically applies when, among other things, a party has succeeded in persuading a court to accept that party's earlier position so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court has been misled. *Arkison*, 160 Wn.2d at 538-39 (quoting *N.H. v. Me.*, 532 U.S. 742, 750-51, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001)); *Ashmore*, 165 Wn.2d at 951; *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 170, 130 S. Ct. 1237, 176 L. Ed. 2d 18 (2010); 28 AM.JUR.2D *Estoppel and Waiver* § 33 (2014). The party taking the positions must have been successful in maintaining the first position. *Burger King Corp. v. Barnes*, 1 F. Supp. 2d 1367, 1372 (S.D. Fla. 1998); *Regents of Univ. of Cal. v. Superior Ct.*, 222 Cal. App. 4th 383, 408, 166 Cal. Rptr. 3d 166, 186 (1st Dist. 2013); *Stewart v. Chautauqua County Bd. of Elections*, 14 N.Y.3d 139, 897 N.Y.S. 2d 704, 924 N.E.2d 812 (2010); 28 AM.JUR.2D *Estoppel and Waiver* § 68 (2014). To find that a party to be

44

estopped has successfully maintained a claim or position requires that the first court adopt the claim or position, either as a preliminary matter or as part of a final disposition. *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 599 n.5 (6th Cir. 1982). The doctrine does not exist for parties to vacate and dismiss the proceeding of their choice.

We expressly hold that judicial estoppel cannot be raised in the first of the two suits. Therefore, we deny Jasman and Morrison's motion to vacate.

*Craig Morrison and Jerry Jasman's Request for Attorney Fees and Costs*

Morrison and Jasman request an award of attorney fees and costs. Since they have prevailed on none of their assignments of error or on their motion, we deny the request.

*D. Angus Lee's Request for Attorney Fees and Costs*

Angus Lee requests an award of attorney fees and costs for responding to Morrison and Jasman's motion on two grounds: RAP 18.9(a) and CR 11. Under RAP 18.9(a), this court may sanction a party "who *uses these rules for the purpose of delay, files a frivolous appeal, or fails to comply with these rules* to pay terms or compensatory damages to any other party who has been harmed by the delay or the failure to comply or to pay sanctions to the court." (emphasis added). Under CR 11, a motion must be (1) "well grounded in fact;" (2) "warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law or the establishment of new law;" and (3) "not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." CR 11 "is made

45

applicable to appeals by RAP 18.7." *Rhinehart v. Seattle Times Co.*, 51 Wn. App. 561, 580, 754 P.2d 1243 (1988).

Angus Lee claims that Morrison and Jasman only filed this motion to delay a decision on the merits until after the deadline has passed for coroner candidates to file for the fall election. Lee, however, forwards no evidence, other than the deadline itself, showing that Morrison and Jasman are using the court rules for delay. Thus, we deny an award of fees under RAP 18.9(a).

We also deny fees under CR 11. The purpose of CR 11 is to deter baseless filings and curb abuses of the judicial system. *Biggs v. Vail*, 124 Wn.2d 193, 197, 876 P.2d 448 (1994); *Skimming v. Boxer*, 119 Wn. App. 748, 754, 82 P.3d 707 (2004). A filing is baseless if it is not well grounded in fact, or not warranted by existing law or a good faith argument for altering existing law. *Skimming*, 119 Wn. App. at 754. The burden is on the movant to justify the request for sanctions. *Biggs*, 124 Wn.2d at 202. Because CR 11 sanctions have a potential chilling effect, the trial court should impose sanctions only when it is patently clear that a claim has absolutely no chance of success. *Skimming*, 119 Wn. App. at 755. The fact that a complaint does not prevail on its merits is not enough. *Bldg. Indus. Ass'n of Wash. v. McCarthy*, 152 Wn. App. 720, 745, 218 P.3d 196 (2009).

No case earlier directly held that judicial estoppel cannot be raised in the first lawsuit. Therefore, we do not find the motion to vacate frivolous.

46

No. 31519-3-III
*Lee v. Jasman*

CONCLUSION

We affirm the trial court. Jerry Jasman is ousted from the position of deputy coroner and may not sign death certificates. We deny defendant Jerry Jasman and intervenor Craig Morrison fees at the trial court and on appeal. We deny Grant County Prosecuting Attorney Angus Lee an award of attorney fees incurred in response to the motion to vacate.

_____
Fearing, J.

I CONCUR:

_____
Brown, A.C.J.

47

No. 31519-3-III

SIDDOWAY, C.J. (dissenting in part) — The majority decides the scope of "public officers" subject to the public office forfeiture statute, RCW 9.92.120, by relying on a statutory definition that, by its terms, applies to only Title 9A RCW. The statutory definition is broader than the common law meaning of "public officer," under which "[a]n employee or a deputy is not an officer." *State ex rel. McIntosh v. Hutchinson*, 187 Wash. 61, 63, 59 P.2d 1117 (1936) (citing *Nelson v. Troy*, 11 Wash. 435, 39 P. 974 (1985)).

The result is to expand the operation of the forfeiture statute so that all "assistants, deputies, clerks, and employees" of any public officer are now subject to quo warranto ouster from government jobs. The forfeiture statute has never been applied that broadly, nor, consistent with other statutes, can it be. I disagree with the majority's construction of the statute and conclude that Grant County Coroner Craig Morrison is entitled to recover his attorney fees.

*I. "Public Office" Forfeiture Under RCW 9.92.120*

The public office forfeiture statute, RCW 9.92.120, was enacted in 1909 as a part of Senate Bill 300, a criminal code. LAWS OF 1909, ch. 249. The 1909 criminal code included a number of provisions that applied to "officers" or "public officers." The forfeiture of public office provision was included in chapter 1 of the law, entitled

"General Provisions." A number of crimes by or against public officers appeared in chapter 4, entitled "Crimes By or Against Public Officers."

In the more than 100 years since its enactment, the forfeiture statute has been applied exclusively to elected public officials, with one distinguishable exception.[1] It was applied to the office of county commissioner of Pierce County in *State ex rel. Guthrie v. Chapman*, 187 Wash. 327, 60 P.2d 245 (1936); to the office of mayor of city of Bremerton in *State ex rel. Knabb v. Frater*, 198 Wash. 675, 89 P.2d 1046 (1939); to the office of judge of city of Seattle municipal court in *State ex rel. Carroll v. Simmons*, 61 Wn.2d 146, 377 P.2d 421 (1962); to the office of sheriff of Snohomish County in *State ex rel. Zempel v. Twitchell*, 59 Wn.2d 419, 367 P.2d 985 (1962); to the office of sheriff of Klickitat County in *Matsen v. Kaiser*, 74 Wn.2d 231, 443 P.2d 843 (1968); and to the office of state legislator in *Kitsap County Republican Central Committee v. Huff*, 94 Wn.2d 802, 620 P.2d 986 (1980).

This appears to be no accident. Cases applying the forfeiture provision imply that limiting the statute's application to elected officials is consistent with its purpose. In 1936, the Washington Supreme Court, noting the few cases decided under the statute, stated, "In the very nature of things, we may not expect to find very much legal authority

---

[1] *Hoflin v. City of Ocean Shores*, 121 Wn.2d 113, 847 P.2d 428 (1993), discussed *infra*.

2

touching the question under consideration, for the reason that cases of this kind are, fortunately, infrequent." *Chapman*, 187 Wash. at 332. Two later decisions treat the forfeiture statute as a corollary to RCW 42.12.010, which addresses events creating a vacancy in an elected office. *Carroll*, for instance, characterized the forfeiture statute as "more specifically spell[ing] out" one of the qualifications for holding an office of public trust, which is that "one may not be convicted 'of any offense involving a violation of his official oath.'" 61 Wn.2d at 150 (quoting RCW 42.12.010). *Twitchell* similarly referred to "the sound and reasonably necessary public policy inherent in RCW 42.12.010 and RCW 9.92.120." 59 Wn.2d at 432. Elsewhere, the *Twitchell* court (explaining why the statutorily imposed vacancy or removal of a public officer from office is not a punishment) quoted *State ex rel. Lysons v. Ruff*, 4 Wash. 234, 243, 29 P. 999 (1892) (Dunbar, J., dissenting) for the proposition that "'[o]*fficers are elected* not for the benefit of the individuals, but for the benefit of the community.'" 59 Wn.2d at 430 (emphasis added).

A broader definition of "officer" or "public officer" is provided by RCW 9A.04.110(13); it includes elected officials but also extends to their assistants, deputies, clerks, and employees. But following the overhaul of Washington's criminal code in 1975, its application has been limited to statutes that define criminal offenses.

3

In 1967 and 1969—reportedly "[b]ecause of the deficiencies in the existing criminal code"—the Washington State Senate adopted resolutions requesting that the Legislative Council prepare a proposed revision of the criminal code. Perry B. Woodall, *Symposium—The Revised Washington Criminal Code*, 48 WASH. L. REV. 1, 2 (1972). The then-existing criminal code, enacted in 1909, was described by former State Senator Woodall as "by and large . . . very poorly drafted, replete with ambiguities, and, in many instances, extremely difficult to comprehend and apply." *Id.* at 1. The Legislative Council's Judiciary Committee and a Citizens' Advisory Committee created by the Judiciary Committee prepared the Revised Washington Criminal Code, which was first introduced in the 1971 regular session of the Washington Legislature. *See id.* at 2. Passage of the Revised Washington Criminal Code was delayed pending submission of an alternative set of bills prepared by the state prosecutors' association, submitted to the legislature in 1973. *State v. Thompson*, 88 Wn.2d 13, 25 n.5, 558 P.2d 202 (1977) (Utter, J., dissenting). The revised criminal code was ultimately enacted in 1975, to be effective July 1, 1976. LAWS OF 1975, 1st Ex. Sess., ch. 260, codified as Title 9A RCW.

The 1975 legislation repealed the definition section enacted in 1909, which had been codified at former RCW 9.01.010 (1909). Among definitions repealed was the definition of "officer" and "public officer" provided by former RCW 9.01.010(24), which had broadly defined the terms to include assistants, deputies, clerks, and employees for

all purposes of Title 9 RCW, "save when otherwise plainly declared or clearly apparent from the context." The 1975 legislature reenacted a broad definition of "officer" and "public officer," codified at RCW 9A.04.110(13), but it limited the definition provision as applying "[i]n this title," and no public office forfeiture provision was included in Title 9A. Recognizing that criminal offenses are defined in statutes outside of Title 9A, the legislature provided in RCW 9A.04.090 that Title 9A's definition section (among other general provisions of the title) would apply to *offenses defined by this title or another statute*, unless this title or such other statute specifically provides otherwise"—but here again, it did not provide that the broad definition would apply to the public officer forfeiture provision, which remained in Title 9 RCW. (Emphasis added.) The 1975 legislature also enacted a statutory principle of construction that "provisions governing the definition of offenses" should be interpreted to further a principal purpose of such provisions, which is "[t]o forbid and prevent conduct that inflicts or threatens substantial harm to . . . public interests." RCW 9A.04.020(1)(a), (2). Viewed as a whole, the 1975 legislation reflects an intent to define "officer" and "public officer" broadly for the purpose of defining crimes but not for other purposes.

By contrast, Washington statutes that deal with whether conviction of a felony forecloses public employment make distinctions between elected officials and their subordinates. Chapter 9.96A RCW, enacted in 1973 (while the Revised Washington

5

Criminal Code was in development) declares it to be the policy of the state of

Washington

> to encourage and contribute to the rehabilitation of felons and to assist them in the assumption of the responsibilities of citizenship, and the opportunity to secure employment or to pursue, practice or engage in a meaningful and profitable trade, occupation, vocation, profession or business is an essential ingredient to rehabilitation and the assumption of the responsibilities of citizenship.

RCW 9.96A.010. To this end, the chapter provides protections for ex-felons' opportunity

to be employed by public entities. While the statute does not preclude a public employer

from *considering* an applicant's prior conviction of crime in making a hiring decision,

RCW 9.96A.020(1) provides (subject to exceptions not applicable to Jerry Jasman) that

> unless there is another provision of law to the contrary, a person is not disqualified from employment by the state of Washington or any of its counties, cities, towns, municipal corporations, or quasi-municipal corporations, nor is a person disqualified to practice, pursue or engage in any occupation, trade, vocation, or business for which a license, permit, certificate or registration is required to be issued by the state of Washington or any of its counties, cities, towns, municipal corporations, or quasi-municipal corporations solely because of a prior conviction of a felony.

As for elected officials, RCW 42.12.010(5), dealing with elective offices, provides

that "[e]very elective office shall become vacant," among other events, on the

incumbent's "conviction of a felony, or of any offense involving a violation of his or her

official oath." The statute under examination in this case, RCW 9.92.120, provides that

the "conviction of a public officer of any felony or malfeasance in office shall entail, in

6

addition to such other penalty as may be imposed, the forfeiture of his or her office, and shall disqualify him or her from ever afterward holding any public office in this state." As previously explained, no statute defines "public officer" or "public office" for purposes of RCW 9.92.120. In the absence of a specific statutory definition, words in a statute are given their common law or ordinary meaning. *State v. Chester*, 133 Wn.2d 15, 22, 940 P.2d 1374 (1997). Because the 1975 legislature explicitly modified the broad statutory definition of "public officer" and "officer" so that it no longer applies to the public office forfeiture statute, the need to give those words in the forfeiture statute their common law meaning is especially clear.

The reasonable construction of chapter 9.96A RCW, RCW 9.92.120, and RCW 42.12.010 in pari materia (which is appropriate, since all deal with eligibility for public employment) is that the legislature intended to strictly disqualify felons from elected office but not to disqualify felons from other employment by a public entity solely because of a prior conviction of a felony. *See Hallauer v. Spectrum Props., Inc.*, 143 Wn.2d 126, 146, 18 P.3d 540 (2001) (we construe statutes that relate to the same subject matter together as constituting a unified whole, to the end that a harmonious, total statutory scheme evolves which maintains the integrity of the respective statutes).

The majority, needless to say, construes these statutory provisions differently. It places substantial reliance on *Hoflin v. City of Ocean Shores*, 121 Wn.2d 113, 847 P.2d

7

428 (1993) and *State v. Korba*, 66 Wn. App. 666, 832 P.2d 1346 (1992). I view the language in *Hoflin* on which the majority relies as dicta. As to *Korba*, I disagree with the court's reasoning, although not its result.

*Hoflin* is the only reported case that has applied the forfeiture statute to an unelected public official. I have several reasons for viewing its statement about public officer status as dicta. First, the Supreme Court observed early in the opinion that the issue of whether the forfeiture statute applied to Mr. Hoflin at all

> was not formally decided by the trial court because it found "just cause" for the dismissal under [Ocean Shores's] Municipal Code. *It was mentioned, but not formally appealed, to the Court of Appeals.* That court did not address it because it ruled that the entire forfeiture statute did not apply. *The issue was not mentioned nor argued before this court.*

121 Wn.2d at 117 n.15 (emphasis added).

Second, the Supreme Court, like the trial court, examined the employment termination issue not as a public office forfeiture issue, but, instead, as turning on (1) whether Mr. Hoflin was either terminable at will or terminable for cause under the Ocean Shores municipal code, which identified conviction of a crime as a basis for dismissal for cause, and (2) whether Mr. Hoflin was afforded due process in connection with the termination of his employment, particularly in light of the city's reliance on the forfeiture statute. The Supreme Court's only references to case law addressing whether the

8

nonelected status of a government employee might matter was to point out (twice) that certain cases it reviewed "all concern[ed] elected officers." *Id.* at 131, 132 n.72.

Third, it is not until the demarcated "conclusion" of the *Hoflin* opinion (its last three paragraphs) that the court states—supported by literally no analysis—that "[a]s a public official of the City of Ocean Shores, [Mr. Hoflin] was subject to RCW 9.92.120 which mandated forfeiture of his office." *Id.* at 135.

My colleagues conclude that this statement in *Hoflin* necessarily means that the term "public officer" as used in the forfeiture statute includes unelected government employees like Mr. Hoflin. Standing alone, that is what it appears to say. But taking into consideration the lack of any analysis that would support that legal conclusion and the court's focus, instead, on the fact that the parties never formally appealed, mentioned, or argued the scope of "public officer," the most reasonable reading is that the *Hoflin* court used the unappealed finding that Mr. Hoflin was a public officer as a "law of the case" basis for its decision. It might have felt bound to, since the city of Ocean Shores characterized itself as reluctant to discharge Mr. Hoflin but required to do so by the forfeiture statute, and it disclaimed reliance on the municipal code provisions that the trial court seized on as a more solid basis for his discharge.

The majority also relies on *Korba*, in which an employee of the vital records office of a county department of health was convicted, among other offenses, of two offenses

9

(injury to record and misappropriation of record) defined by RCW 40.16.020. On appeal, Ms. Korba challenged the broad definition of "officer and public officer" that the trial court included in its instructions to the jury on the offenses charged under chapter 40.16 RCW—a definition it derived from RCW 9A.04.110(13). Division Two of our court appears to have concluded that the definitions in RCW 9A.04.110(13) did not directly apply to offenses defined in chapter 40.16 RCW, and so relied on the fact that both the criminal statute and the broad definition could be traced to chapter 249 of the Laws of 1909. It reasoned that "[c]learly, the 1909 Legislature intended for the criminal code definition of public officer to apply to the public records provisions" and "[o]ur duty is to give effect to the intent of the Legislature"; and, from that, it applied the 1909 statutory definition. 66 Wn. App. at 670.

It was a mistake, in my view, for the *Korba* court to rely on the 1909 legislature's intent in enacting legislation that had since been repealed. A change in legislative intent is presumed when a material change is made in a statute. *Davis v. Dep't of Licensing*, 137 Wn.2d 957, 967, 977 P.2d 554 (1999). The court should not have ignored, nor can we, the fact that the changes made by the 1975 legislature limited the application of the broad statutory definition of "officer" and "public officer" to statutes that define criminal offenses. The *Korba* court would have reached the same result, and for a better reason, had it relied on the intent of the 1975 legislature as reflected in RCW 9A.04.090, which

extended the definitions in chapter 9A.04 RCW to "offenses defined by . . . another statute," such as RCW 40.16.020.

Because the public office forfeiture statute disqualified Mr. Jasman from holding only "any public office in this state," with "public office" having its narrow common law meaning, the trial court erred in granting the prosecuting attorney's motion for summary judgment and enjoining Mr. Jasman from signing death certificates as a deputy and investigator for the Grant County Coroner.

## II. Appointment of Special Prosecutor

I also part ways with the majority on Coroner Morrison's right to appointment of a special prosecutor. His circumstances present a question of first impression as to the prosecuting attorney's duties under RCW 36.27.020.

From the perspective of Coroner Morrison, the quo warranto action was politically motivated, reflecting "longstanding harassment" that he claimed his office had been subjected to by Prosecuting Attorney D. Angus Lee. Clerk's Papers (CP) at 163. His first response to the action was to submit a request to the Grant County commissioners to defend and indemnify Mr. Jasman, whom he contended had merely followed his instructions and acted in good faith within the scope of his employment. The county commissioners initially approved Coroner Morrison's request for indemnification of Mr.

11

Jasman, but later reversed their decision "[b]ased on legal advice from the Prosecuting Attorney's office." CP at 164.

The fact that Prosecuting Attorney Lee advised the county commissioners not to indemnify Mr. Jasman resulted in the disqualification of his office from representing Mr. Lee as plaintiff in the quo warranto action. While the disqualification itself has no bearing on Coroner Morrison's right to appointment of a special prosecutor, the trial court's reasoning in disqualifying the prosecutor's office does. The trial court's order on the conflict of interest stated:

> The Court believes that the Coroner is the real party in interest. It is clear that the Coroner can hire any individual the elected Coroner chooses, as long as the position and funding have been created by the County Commission. . . . *Osborn*[ ] *v. Grant County*, 130 Wn.2d 615[, 926 P.2d 911] (1996). . . . Further, as indicated in *Osborn*[ ], *supra*, the Grant County Prosecutor does have an obligation to advise the County Coroner and the County Commission.

CP at 349. While the county filed a notice of cross appeal of these determinations, it later abandoned the appeal with the result that these rulings are law of the case.

After the prosecutor's office was disqualified, Coroner Morrison moved to intervene in the quo warranto action on grounds that the action interfered with his authority to hire deputies and employees as well as his authority to delegate tasks. The motion was granted and Coroner Morrison was aligned with Mr. Jasman as a defendant. It was after Coroner Morrison had been added as a party and aligned as a defendant that

he requested appointment of a special prosecutor in light of Prosecuting Attorney Lee's

conflict of interest.

RCW 36.27.020(2) provides that the prosecuting attorney "shall [b]e legal adviser

to all county . . . officers . . . in all matters relating to their official business." RCW

36.27.020(3) provides that the prosecuting attorney "shall [a]ppear for and represent . . .

the county . . . in all criminal and civil proceedings to which . . . the county . . . may be a

party." And in Washington, because the prosecuting attorney is also the county attorney,

> the relations of [the prosecuting attorney] to the county may be such as
> possibly require him to appear in behalf of the county in some instances,
> even if the specific duty may not be particularly and expressly prescribed
> by statute. If so, the duty arises out of the obligations he has assumed as an
> officer of the county to discharge the general functions of an attorney in his
> behalf.

*Bates v. Sch. Dist. No. 10*, 45 Wash. 498, 502, 88 P. 944 (1907).

In *In re Welfare of Lewis*, 51 Wn.2d 193, 202, 316 P.2d 907 (1957), our Supreme

Court held that the "letter and spirit of the statute prescribing the duties of the prosecuting

attorney are broad enough to include the duty to assist the court in a juvenile court

proceeding when his services are needed," even though the party requiring representation

in that case was a county probation officer rather than the county itself. The court

reasoned in part that the county was the real party in interest, but it also recognized that

> the probation officer, untrained in and unacquainted with . . . technical
> questions, cannot be expected to aid the court in their solution.
> Nevertheless, the court must dispose of these questions. . . . The effective

13

and orderly conduct of juvenile hearing is a matter with which the state and county are both deeply concerned.

*Id.*; *accord Fuqua v. Fuqua*, 88 Wn.2d 100, 102, 558 P.2d 801 (1977) ("The authority of the prosecuting attorney to appear in actions which present issues concerning county officials and their operation of county departments has been broadly construed in this state."); *Neal v. Wallace*, 15 Wn. App. 506, 507-08, 550 P.2d 539 (1976) (holding that where a superior court judge was named a defendant in an action for a writ of mandamus, "the prosecuting attorney is the proper court representative of the Superior Court judge").

"RCW 36.27.020 does not except from the duty to defend those matters in which the prosecutor disagrees with his county or state client." *Westerman v. Cary*, 125 Wn.2d 277, 300, 892 P.2d 1067 (1994). A disagreement between a prosecutor and a county officer entitled to representation can create a disabling conflict of interest, however, requiring the appointment of a special prosecutor to represent the officer. To justify the appointment of a special prosecutor, "a prosecutor must have both a duty to represent an official and a disability that prevents the prosecutor from representing the official." *Id.* at 298.

The majority recognizes that the Grant County prosecuting attorney's conflict of interest created a disability, but it concludes that the prosecuting attorney had no duty to Coroner Morrison because Grant County was not the real party in interest and Coroner Morrison "voluntarily inserted himself" into the litigation. Majority at 41. Washington

14

cases have relied on the county being the real party in interest as *one* basis for requiring a prosecutor to represent a county official, but have never held that it is the only basis on which an official is entitled to representation. *See, e.g., Lewis*, 51 Wn.2d at 202; *Osborn*, 130 Wn.2d at 629 (holding that the Grant County prosecutor had a statutory duty to be legal advisor to the county clerk even though she was not embroiled in litigation in which the county was the real party in interest). And to say that Coroner Morrison "voluntarily inserted himself" into the quo warranto action is to ignore the trial court's unappealed determination that the coroner was the real party in interest. Mr. Jasman could not and did not hire himself and assign himself responsibilities—it was Coroner Morrison's hiring and management decisions that were threatened by the quo warranto action. The prosecuting attorney knew that it was the coroner's perceived prerogative that he placed at issue by bringing the action below.

There are only a half dozen or so reported cases analyzing a prosecuting attorney's duty under RCW 36.27.020 to represent a county officer in civil litigation relating to the business of his or her office. That may be due to the enactment in 1979 of former RCW 36.16.134, now codified at RCW 4.96.041, authorizing local governments to enact indemnification ordinances or resolutions under which an officer or employee can often more readily request and be entitled to a defense at local government expense. It was the county commissioner's ultimate refusal to indemnify Coroner Morrison and Mr. Jasman

15

under that provision (the subject matter of their separate lawsuit, not at issue in this appeal) that led the coroner to rely, alternatively, on the prosecuting attorney's duty of representation under RCW 36.27.020.

No reported case presents the following combination of circumstances present here and that, under the cases described above, support Coroner Morrison's right to have had the court appoint a special prosecutor under RCW 36.27.020:

> An elected county official who was the real party in interest (an unappealed determination that is law of the case);

> Who was entitled by statute to be advised in the matter by the prosecuting attorney (also an unappealed determination, and law of the case);

> Who could not be provided with the needed legal advice by the office of the prosecuting attorney in light of the conflict of interest, whose request for appointment of a special prosecutor was deferred and ultimately denied, and who necessarily sought legal advice elsewhere;

> Who did not initiate the quo warranto lawsuit but, as the real party in interest, reasonably intervened and responded to it; and

> Who responded through his necessarily retained lawyer to legal issues to which he could not have been expected to respond pro se, and as to which both the trial court and this court depended on his competent legal representation to resolve the legal issues.

Since we can no longer provide the relief of ordering appointment of a special prosecutor, Coroner Morrison's attorney fees are recoverable as the equivalent of legal service that the prosecutor was directed by statute to provide. *See Nichols v. Snohomish*

16

No. 31519-3-III
*Lee v. Jasman*

*County*, 109 Wn.2d 613, 620, 746 P.2d 1208 (1987). I would award Coroner Morrison

his attorney fees and costs incurred in the trial court and on appeal.

For these reasons, I respectfully dissent on the issues of Mr. Jasman's removal

from the position of deputy coroner and Coroner Morrison's entitlement to recover his

fees incurred from Grant County.

_____
Siddoway, C.J.

17